UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE #s: 23-CR-80068-AHS(s)
24-CR-60004-AHS

UNITED STATES OF AMERICA,

v.

KAREEM MEMON,

    Defendant.
_____/

### UNITED STATES' SENTENCING MEMORANDUM AND RESPONSE IN OPPOSITION TO THE DEFENDANT KAREEM MEMON'S REQUEST FOR A DOWNWARD VARIANCE

The United States, through the undersigned Assistant United States Attorney, hereby files this Sentencing Memorandum and response in opposition to Defendant Kareem Memon's Request for a Downward Variance (the "Motion") filed under seal (23-CR-80068-AHS, DE 57-58; 24-CR-60004-AHS, DE 23-24).[1] For the reasons discussed more fully below, the Defendant's Motion should be denied.

### I. BACKGROUND

On September 21, 2023, without the benefit of a plea agreement, Defendant Kareem Memon ("Defendant" or "Memon") pled guilty to all Counts of a Superseding Information which charged one count of wire fraud, in violation of 18 U.S.C. § 1343; two counts of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a); and one count of felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) (23-CR-80068-AHS, DE 27, 31-32).

---

[1] As the Defendant's motion for downward variance was filed under seal, the undersigned Assistant U.S. Attorney wasn't alerted that a copy of the motion that was forwarded to the undersigned via email until recently.

1

On February 8, 2024, pursuant Rule 20 transfer from the District of New Jersey, the Defendant pled guilty to a two-count Information which charged conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349; and conspiracy to violate the federal anti-kickback statute, in violation of 18 U.S.C. § 371 (24-CR-60004-AHS, DE 1, 14-16).  As a part of the written plea agreement in Case # 24-CR-60004-AHS, the parties agreed that the actual loss to Medicare from the Defendant's participation in the offense is approximately $11,384,001 (24-CR-60004-AHS, DE 15, 16; Presentence Investigation Report ("PSR"), ¶¶ 6-9).  In case number 23-80068-AHS, Probation calculated an actual loss amount of approximately $451,154.00 (PSR, ¶ 52).  The Defendant filed an objection to the PSR as to Probation's assessment of the number of firearms attributable to him, however, does not object to the accuracy of the PSR as to loss amount in either case. *See* Defendant's Objection to the PSR (23-CR-80068-AHS, DE 46, 56; 24-CR-60004-AHS, DE 22).

Sentencing is scheduled for May 14, 2024.  In anticipation of the sentencing hearing, the Defendant filed a motion for downward variance. *See* Defendant's Motion.  In his Motion, the Defendant requests that the Court vary downward from the guideline imprisonment range of 121-151 months and argues that the recommended guideline sentence is disparate from the sentence imposed in cases which involve defendants exposed to guideline provision 2B1.1 whose criminal history category ("CHC") is III.  The Defendant offers as basis for the variance, remoteness of his criminal history, mental health and substance abuse deficits and status as the sole biological caretaker for his child.  *See generally* Defendant's Motion.

**II. ARGUMENT**

"When sentencing a criminal defendant, district courts are required to consider the advisory guidelines range and the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Howard,* 28 F.4th 180, 204 (11th Cir. 2022) (citing *United States v. Rosales-Bruno*, 789 F.3d 1249, 1253-54

2

(11th Cir. 2015). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the sentencing range, (5) policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution. *See* 18 U.S.C. §3553(a). A district court is required to consider the factors in 18 U.S.C. §3553(a) and determine a reasonable sentence. *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005). While a court must consider all the relevant factors, it "need only acknowledge that it considered [them] and need not discuss each of these factors in either the sentencing hearing or in the sentencing order." *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007). The Court may give greater weight to some factors than others. *See United States v. Shaw,* 560 F.3d 1230, 1238 (11th Cir. 2009).

Furthermore, although the sentencing guidelines are only advisory, a major variance from the guidelines range "should be supported by a more significant justification than a minor one," and a court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall v. United States*, 552 U.S. 38, 50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); *see also United States v. Irey*, 612 F.3d 1160, 1196 (11th Cir. 2010) (en banc) ("Although there is no proportionality principle in sentencing, a major variance does require a more significant justification than a minor one ...."). In this case, the Section 3553(a) factors weigh heavily in favor of a substantial custodial sentence. Section 3553(a) factors, in particular the seriousness of the offense, the need for deterrence, the Defendant's personal characteristics weigh in favor of and support the recommended guideline sentence of 121-151 months.

"The findings of fact of the sentencing court may be based on…facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing." *United States v. Gayle*, 406 F. App'x 352, 365 (11th Cir. 2010) (quoting

3

*United States v. Saunders*, 318 F.3d 1257, 1271 n.22 (11th Cir. 2003) (internal quotations omitted)); *see also United States v. Bennett*, 472 F.3d 825, 832, 833–34 (11th Cir. 2006) (noting that if a defendant fails to lodge specific objections to facts contained in a PSR despite the opportunity to do so, he "is deemed to have admitted those facts"). The government submits that the recommended sentence range would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2). The Defendant's request for a downward variance should be denied.

**A. The Nature and Circumstances of the Offense**

The crimes committed by the Defendant are undoubtedly serious. As described more fully below, not only did the Defendant conspire with others to commit a substantial healthcare fraud, the success of which hinged on the Defendant's active participation and from which he benefitted, the Defendant continued his deceit and misrepresentation when he defrauded the government by committing wire fraud in connection with Coronavirus Aid Relief, and Economic Security ("CARES") Act programs.

The undisputed facts on the record establish that Memon was an active participant in a two-year long, from 2017 through around 2020, conspiracy to commit healthcare fraud and benefited from the conspiracy, in that, he received monetary kickbacks in excess of $1.4M, as a part of the scheme (24-60004-AHS, DE 15-16; PSR, ¶¶ 82, 90). Moreover, from June 2020 through December 2020, the Defendant's criminal activity continued wherein he engaged in a wire fraud scheme to defraud the government and enrich himself by exploiting the CARES Act programs, a program established to provide emergency financial assistance to the businesses suffering the economic effects caused by the COVID-19 pandemic (PSR, ¶¶ 41-44). In this scheme, the Defendant defrauded the government out of more than $450,000 (PSR, ¶¶ 49-58). In addition, the Defendant's status as a convicted felon did not deter him from committing crimes, including

4

possessing multiple semi-automatic firearms of various caliber and an abundance of ammunition (PSR, ¶¶ 60-61, 64).

The Defendant's long running crimes resulted in Medicare being defrauded of over $11 million, and he helped further the overall conspiracy by abusing the trust that the American people put in him as a professional in the health care industry. As agreed to by Memon, the Defendant obtained doctor's orders for durable medical equipment ("DME") for Medicare beneficiaries through the use of his supply companies and through his relationships with telemedicine companies. Memon and his co-conspirators transmitted the completed doctors' orders to the DME companies for processing. The DME companies arranged for the prescribed DME to be shipped to the individual Medicare beneficiaries. The DME companies electronically submitted or caused the electronic submission of claims to Medicare from New Jersey and elsewhere for payment, which Memon knew such claims were fraudulent, in that they were not medically necessary and not reimbursable by Medicare. In furtherance of the conspiracy, Memon received kickbacks to the tune of at least $1,486,261.78 (24-CR-60004-AHS, DE 16).

On June 24, 2020, the Defendant applied for an Economic Injury Disaster Loan ("EIDL") on behalf of KSM Enterprise Inc. ("KSM"), for which he is the president, registered agent and sole officer (PSR, ¶¶ 41, 46). On the EIDL application, the Defendant falsely reported gross revenue for the twelve months prior to the date of the disaster (January 31, 2020) as $246,782.00, cost of goods sold at $118,287, and one employee (PSR, ¶ 41). The Defendant executed and uploaded the loan agreement on July 7, 2020 (*id.*).

The Small Business Administration ("SBA") subsequently approved the EIDL and disbursed funds into KSM's Wells Fargo bank account ending in 3088 (PSR, ¶ 42). The SBA disbursed to total of $64,200 of EIDL proceeds to the Defendant (*id.*).

5

On June 25, 2020, one day after the Defendant submitted the fraudulent EIDL application, he applied for a Paycheck Protection Program ("PPP") loan on behalf of KSM in the amount of $386,954 with Kabbage, LLC, a PPP loan provider (PSR, ¶ 43). On the PPP loan application, the Defendant falsely reported that KSM's monthly average payroll was approximately $257,782 and that KSM had 15 employees (*id*.). In support of his fraudulent application, the Defendant submitted three documents: (1) W3 for Tax Year 2019, which reflected wages, and income and Social Security wages in the amount of $1,857,380 (for which, $154,782 is the monthly average); (2) KSM's Articles of Incorporation; and (3) a copy of his driver's license (PSR, ¶ 44). The Defendant, in the PPP loan application, also falsely indicated that the purpose of the PPP loan was for KSM's payroll and lease (PSR, ¶ 45). Florida's Department of Revenue indicated that KSM had not registered to file payroll taxes and there were no existing payroll records for KSM (*id*.). A review of bank records for KSM's Wells Fargo account ending in 3088, for which the Defendant was the sole signatory, revealed no payroll expenses consistent with an entity with 15 employees during the two-year period between 2019 and 2020 (*id*.).

On July 1, 2020, Kabbage disbursed $386,954 in fraudulently obtained PPP loan proceeds and deposited the funds in Wells Fargo account ending in 3088 (PSR, ¶ 50).

The investigation further revealed that the Defendant engaged in transactions involving the falsely and fraudulently obtained loan proceeds (PSR, ¶ 51). On July 6, 2020, the Defendant made a cash withdrawal in the amount of $50,000, from KSM Wells Fargo account ending in 3088, identified with withdrawal receipt number 4057 (PSR, ¶ 53). Thereafter, on July 22, 2020, the Defendant executed a wire transfer of approximately $288,102 from KSM Wells Fargo account ending in 3088 to the U.S. Internal Revenue Service (*id*.). From the criminally derived proceeds of the fraud, the Defendant consumed approximately $358,102 (PSR, ¶ 56).

Here, the Defendant side steps the seriousness of the offenses he committed and argues that a sentence reduction is warranted to avoid sentence disparity and offers for consideration and in mitigation his mental health and substance abuse status and his criminal history. In short, the Defendant conspired to steal more than $11 million from a Federal health care program designed to provide health care coverage to our nation's elderly and disabled, more than $450,000 in CARES Act Coronavirus Emergency Relief programs' designed to provide assistance to fledgling businesses affected by the COVID-19 pandemic. In addition, the Defendant possessed firearms as a convicted felon. Such crimes and conduct are egregious, both individually and cumulatively. Indeed, the Defendant does not challenge, in fact, concedes the seriousness of the offenses in his motion for a downward variance. (*See* Defendant's Motion). This factor weigh heavily in favor of a significant custodial sentence.

**B. The History and Characteristics of the Defendant**

A review of the history and characteristics of the Defendant shows that he grew up in two-parent household, has two children and has the support of his family (PSR, ¶¶ 142-146, 162-163). The Defendant, who is fluent in two languages - English and Urdu, dropped out of high school, but acquired his General Education Development (GED) (PSR, ¶¶ 162-163). The PSR documents the Defendant's employment history, which indicate that the Defendant held profitable businesses (PSR, ¶¶ 164-170). The Defendant urges the Court to consider the fact that he is the sole biological parent of one of his two children. The government is not without concern for the welfare of the children and those individuals impacted by the Defendant's criminal conduct. Sadly, it was the Defendant who showed no concern for the welfare of his children or his family while he committed crimes. It goes without saying that one of the primary consequence of an offender's criminal conduct is the impact on the offender's family and the public. The Defendant should not receive a benefit for his poor and criminal choices.

***Substance Abuse and Mental Health***

Probation reports that the Defendant has a history of controlled substance use, which started as early as in and around 2004 (at age 14), and included the use of marijuana, ecstasy, as well as oxycodone and Xanax without a prescription (PSR, ¶¶ 154-158). For the Court's consideration, the Defendant proffered that he was examined by Dr. Brannon who reported that the Defendant suffered from eleven different mental health disorders; seven of which were substance abuse related and the others include generalized anxiety disorder, ADHD and persistent depressive disorder. Notwithstanding Dr. Brannon's recommendation of Defendant's placement in a long-term, residential, dual diagnosis program, Dr. Brannon's recommendation does not exclude either the mental health treatment program or substance abuse treatment program offered by the Bureau of Prisons ("BOP"), which many inmates take advantage and successfully complete. As this Court is aware, BOP is fully staffed with psychologists and psychiatrists who provide a full range of evaluative mental health studies, as well as mental health treatment through counseling (and if deemed medically necessary, medication). Such treatment is provided in either a group setting or on an individual basis. *See* www.bop.gov/inmates/custody_and_care/ mental_health.jsp.

In addition, BOP's substance abuse treatment program has made a significant difference in the lives of inmates, their families, and their communities. BOP reports that studies for in-prison populations programs that are well-designed, carefully implemented, and utilize effective practices "reduce relapse, reduce criminality, reduce recidivism, reduce inmate misconduct, increase the, like BOP's implemented programs, level of the offender's stake in societal norms, increase levels of education and employment upon return to the community, improve health and mental health symptoms and conditions, improve relationships. Collectively, represent[ing] enormous safety and economic benefits to the public." www.bop.gov/inmates/custody_and_care/ substance

_abuse_treatment.jsp.  Probation reports that the Defendant successfully completed a detox program in November 2023, as well as a post-detox program (PSR, ¶ 161).  The government commends the Defendant in his maintenance of self-control and sobriety.  However, if continued therapy is required and if the Defendant is eligible, BOP's Residential Drug Abuse Program, a nine-month long program, is an effective and highly valued program to assist inmates in their recovery.

### *Criminal History*

The Defendant's criminal history is significant and should not be characterized as a product of "an arbitrary sentencing practice that resulted in disparate sentencing outcomes" (Defendant's Motion, ¶ 9).  In relevant part, the Defendant argues that (1) "all 6 of the scored criminal history points [Probation attributes to him] originate from offenses Memon committed between 2010-2012 when the Defendant was 19-21 years old;" and (2) the points were the result of the arbitrary sentence practice in Broward County State Court.  *See* Defendant's Motion.

In this case, Probation calculated the Defendant criminal history with **8** criminal history points (PSR, ¶ 148), which included two felony drug trafficking offenses (PSR, ¶¶ 140, 143), two felony drug possession offenses (PSR, ¶¶ 139, 146), one misdemeanor drug offense (PSR, ¶ 144), one felony offense of dealing in stolen property (PSR, ¶145) and one traffic offense (PSR, ¶ 141).

In his motion for downward variance, and without regard to nature of the prior offenses or the benefit the Guidelines conveyed to the Defendant pursuant to 4A1.1(c), which limits the total number of criminal history points assessed under 4A1.1(c) to a maximum of 4 criminal history points, the Defendant attacks Probation's assessment and urges this Court to accept his argument that the sentence imposed in the underlying offenses were the basis of an arbitrary practice in State Court.

Pursuant to 4A1.1(c), the Defendant received 1 criminal history for each of the convictions outlined in paragraphs 139, 140, 141, 144, 145, 146 for a total of six (6) criminal history points. However, only four (4) criminal history points were assessed under 4A1.1(c). Pursuant to 4A1.1(b), the Defendant received two (2) criminal history points for the convictions of delivery of cocaine, possession of Alprazolam, possession of MDMA and possession of cannabis, as outlined in paragraph 143 of the PSR. Taking 4A1.1(c) into account, calculation results in a total criminal history point of six (6) criminal history points and CHC III (PSR, 148). If all the points were calculated without regard to 4A1.1(c), the Defendant would have been position in a criminal history category of IV and result in a sentencing range of 135-168 months imprisonment.

It's important to note that from 2010 through 2017, just prior to the Defendant's participation in the conspiracy to commit healthcare fraud in 2017, the Defendant was arrested and convicted of numerous offenses. Although Probation has prepared a thorough PSR, the undersigned Assistant United States Attorney summarizes the timeline of Defendant's criminal history below:

***Criminal History Timeline***:

On January 11, 2010, the Defendant was arrested for felony possession of alprazolam (PSR, ¶ 139). He pled guilty on July 21, 2010, and was given a two-year probationary sentencev (*id.*). The Defendant violated his probationary sentence based on a new arrest on February 23, 2011, for trafficking MDMA, possession with intent to sell cocaine and possession of a weapon or ammunition by a convicted felon (*id.*). On September 22, 2011, the Defendant admitted the violation and the probation period was extended for a 3-year term (*id.*).

Some six months after his first arrest, on June 5, 2010, the Defendant was arrested again. This time he is charged with felony possession of alprazolam with intent to sell or deliver (PSR, ¶ 140). On July 21, 2010, the Defendant pled guilty and was sentenced to two-year term of

10

probation. As reflected in the case above, the Defendant violated his probationary sentence based on the arrest on the arrest on February 23, 2011, for trafficking MDMA, possession with intent to sell cocaine and possession of a weapon or ammunition by a convicted felon (*id.*). On September 22, 2011, the Defendant admitted the violation and the probation period was extended for a 3-year term (*id.*).

While these two matters were pending, the Defendant is arrested on January 24, 2011, and charged with displaying another person's identification (PSR, ¶ 142). The Defendant entered a nolo plea on September 7, 2011 (*id.*). Note that for this offense, the Defendant received no criminal history points (*id.*).

Less than a month after the use of another's identification offense, on February 23, 2011, and while on probation, the Defendant is arrested and charged with delivery of cocaine, possession of alprazolam, possession of MDMA and possession of cannabis (PSR, ¶¶ 139, 140, 143). On September 22, 2011, the Defendant pled guilty to all counts (*id.*). The Court imposed a concurrent three-year probationary sentence as to Counts 1-3 and a term of imprisonment of 210 days as to Count 4, with credit for time served (*id.*).

The Court granted early termination of the Defendant's three-year probationary terms, which terminated on October 11, 2012 (PSR, ¶¶ 139, 140, 143). Two weeks after the termination of his probation, on October 26, 2012, the Defendant is arrested and charged with possession of cannabis and contributing to the delinquency of a minor (PSR, ¶ 144). While this matter was pending, the Defendant was arrested on two separate occasions: on March 21, 2013, for dealing in stolen property (PSR, ¶ 145); and on April 17, 2013, for felony possession of alprazolam (PSR, ¶ 146). As to the possession of cannabis and contributing to the delinquency of a minor charge, on April 25, 2013, the Defendant entered a nolo plea, and was sentenced to concurrent terms of thirty (30) days jail with two (2) days credit for time served (PSR, ¶ 144). On January 6, 2014, the

Defendant entered a nolo plea to the offense of dealing in stolen property and possession of alprazolam (PSR, ¶¶ 145, 146). The Defendant was sentenced to concurrent five-year term of probation as to both cases (*id.*). The Court terminated the Defendant's five-year probationary term on August 4, 2016 (*id.*).

Within a short time period after the termination of the five-year probation term, the Defendant entered the instant conspiracy to commit healthcare fraud in 2017. But for the early termination of his probationary period, the Defendant would have been in violation. Notwithstanding the Defendant's argument, that the "arbitrary" imprisonment terms imposed in the offenses described paragraphs 139-140, 143-146, the Defendant was given numerous opportunities to live a lawful life. Instead of lengthy imprisonment terms, the State Court imposed and the Defendant received the benefit of probationary sentences, which he violated by committing additional crimes. He received the benefit of early termination of his probationary term and thereafter, and continued to commit crimes without much of a gap in time.

### C. Seriousness of the Offense; Promote Respect for the Law; Provide Just Punishment

A sentence within the range of 121-151 months reflects the seriousness of the offense, promotes respect for the law, and provides a just sentence. The Defendant committed extremely serious crimes—one that involved thousands of lies to Medicare causing Medicare to pay out millions for items that were ineligible for reimbursement and/or not medically necessary and caused a loss approximately $11,384,001 to Medicare. Moreover, the Defendant netted through his supply companies approximately $1,486,261.78 in kickbacks and netted over $451,000 in fraudulent EIDL and PPP proceeds. And although the number of firearms attributable to the defendant is refuted, the Defendant, a felon, does not deny that as a prohibited person and he unlawfully possessed firearms. This conduct necessitates serious punishment. A sentence within

the guidelines of 121-151 would adequately promote respect for the law and provide just punishment.

### D. Need to Deter Future Criminal Conduct

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered. Here, the United States respectfully submits that a sentence of 121 to 151 months is necessary to serve this purpose. The size of the Defendant's crimes and the seeming frequency with which such similar crimes are committed in this State are dismaying. Thus, the deterrent message and effect of a substantial custodial sentence imposed by the Court in this case will resonate significantly with any individual tempted to engage in white-collar crime like that which the Defendant perpetrated.

A guideline sentence is appropriate for the further reason that white-collar crime can be seriously affected by the imposition of significant, Guidelines-range sentences. As the United States Court of Appeals for the Eleventh Circuit has observed, "[d]efendants in white collar [cases] often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). Thus, it is this type of mentality that is most amenable to deterrence. See, e.g., *id*. at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks and alteration omitted)); *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997) ("[White collar] crime is not as feared as violent crime or drug offenses, but like the latter it requires heavy sentences to deter because it is potentially very lucrative."). A significant sentence of imprisonment will help ensure that others know that fraud will result in more than a repayment order or fine, but rather will result in a meaningful, predictable prison term.

### E. Need to Avoid Unwarranted Disparities

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted sentencing disparities." Here the Defendant argues for a reduced sentence to comport with a sentence of "104" months imposed on certain defendants whose primary guideline was Section 2B1.1 with a final offense level of 30 and a criminal history Category of III. *See generally* Motion at ¶ 7. First, the primary focus of Sentencing Commission is to reduce sentencing disparities and promote transparency and proportionality in sentencing. The Guidelines are established to objectively calibrate criminal history points and criminal history category consistent with offenders with similar criminal histories. Second, the Defendant fails to provide this Court with any specific case or any supporting citation for his claim that "for the 8 defendants … who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 104 months and the median length of imprisonment imposed was 105 months." Moreover, he fails to state the nature, scope, criminal role or character of each of the "8 defendants." Without more, the Defendant urges this Court to impose a reduced sentence in a vacuum. The Court should deny the Defendant's motion for downward variance.

WHEREFORE, for the foregoing reasons, the Government respectfully opposes the Defendant's Motion for Downward Variance and respectfully requests that the Court deny the Defendant's Motion.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   */s/ Robin W. Waugh*
ROBIN W. WAUGH
Assistant United States Attorney
Florida Bar No. 0537837
500 S. Australian Avenue
West Palm Beach, Florida 33401
Tel: (561) 820-8711
Robin.waugh@usdoj.gov

14

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 13, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                                          By:    */s/ Robin W. Waugh*
                                                                ROBIN W. WAUGH
                                                                ASSISTANT UNITED STATES ATORNEY